# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| JUSTIN BORUM, and CHELSEA RUSHING, individually and as heirs-at-law to the ESTATE OF TERRY BORUM, and GRADY BORUM,<br><br>Plaintiffs,<br><br>v.<br><br>SWISHER COUNTY,<br><br>Defendant. | § § § § § § § § § § § § | NO. 2:14-CV-127-J |

## MEMORANDUM OPINION AND ORDER

On December 29, 2014, Defendant filed a *Partial No Evidence Motion for Summary Judgment* and supporting brief, seeking dismissal of Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Defendant's Motion did not address Plaintiffs' separate claims under 42 U.S.C. § 1983. Plaintiffs filed a response on January 7, 2015. Defendant did not file a reply. Defendant's motion is DENIED.

## BACKGROUND

On February 1, 2013, Terry Borum—a fifty-three-year-old pre-trial detainee at the Swisher County jail—collapsed in his cell, struck his head, and was knocked unconscious. Approximately two to three hours later, Mr. Borum died at the Northwest Texas Hospital in Amarillo. According to the autopsy, the cause of death was blunt force trauma to the head, caused by Mr. Borum's fall.

Plaintiffs—the son, daughter, and father of Terry Borum, and the heirs-at-law to the Estate of Terry Borum—filed their complaint in this Court on May 28, 2014 against Defendant

1

Swisher County, Texas.  In their complaint, Plaintiffs assert causes of action under the ADA, the RA, and 42 U.S.C. § 1983.  Plaintiffs also assert a survival claim and a wrongful death claim, pursuant to § 1983 and the ADA/RA.  Defendant filed a *Rule 12(b)(6) Motion to Dismiss* on June 20, 2014, which the Court denied on September 29, 2014.

Terry Borum suffered from alcoholism and severe depression.  In 2011, Mr. Borum attempted to commit suicide with a shotgun.  The suicide attempt was unsuccessful and left Mr. Borum permanently disfigured—the shotgun blast destroyed significant portions of Mr. Borum's face.  As a result, Mr. Borum could not speak clearly, had difficulty breathing, and was blind in one eye.  He also could not eat solid food and instead required a liquid diet, which was administered through a feeding tube sewn inside his stomach.  County Sheriff Cody Grubb was aware of Mr. Borum's physical disabilities, suicide attempt, and alcoholism prior to his detention in the Swisher County jail.  Likewise, jail staffers Jason Irwin and Mark Sanchez were aware that Mr. Borum was an alcoholic.

On January 28, 2013, Mr. Borum was arrested on an outstanding warrant and was detained in the Swisher County jail.  The official who booked Mr. Borum noted his physical deformities, past suicide attempt, and unique feeding requirements.  At the time of the booking, jail administrators were concerned about their ability to properly care for a detainee like Mr. Borum:

"Q: When you saw the mug shot, did you think there was going to be a problem with housing Mr. Borum safely in the jail?

A: Yeah.

Q: Tell me why you thought that.

A: You could obviously tell he was a medical risk. I mean, we couldn't—we couldn't

take care of him."

Pointer Dep. 17:13-20 (App. 59). Members of the jail staff were also aware that Mr. Borum was

experiencing symptoms of alcohol withdrawal, including hallucinations, at the time of his

detention.

During the course of Mr. Borum's three-plus days in the Swisher County jail, he received

no medical care of any kind, despite the fact that he began hallucinating, behaved erratically, and

was likely suffering from delirium tremens ("DTs")—a severe form of alcohol withdrawal that

causes tremors and other changes to the nervous system. Indeed, jail staffer Martin Sanchez

expressly stated that Mr. Borum's serious medical conditions were ignored by the jail staff:

"Q: Did you ever ignore something that Mr. Borum needed?

A: Yes.

Q: What'd you ignore?

A: His medical condition."

Sanchez Dep. 217:5-9 (App. 17). Jail staffers did not receive training on providing medical care

to prisoners or on accommodating prisoners with disabilities. Although the jail administrator had

requested such training in the past, those requests were denied because there wasn't room in the

budget. As a result, jail staffers admitted that "we were understaffed and not really medically

qualified to take care of someone in [Mr. Borum's] condition." Irwin Dep. 15:18-20 (App. 50).

The only food Mr. Borum received during his three days of confinement was a mixture of

honey and orange juice, which was the County's standard method of "treating" inmates

experiencing alcohol withdrawal symptoms. Sheriff Grubb stated his belief that the County

should continue to use the honey and orange juice treatment because the cost of providing actual

medical care to inmates experiencing alcohol withdrawal was too expensive. The County also failed to provide Mr. Borum with the type of liquid diet necessitated by his disability and feeding tube.

Eventually, because Mr. Borum's physical and mental condition continued to deteriorate, jail officials placed him in a detox cell, where he spent the night screaming incoherently, talking to invisible friends, and trying to pull an imaginary person out of the toilet. Despite this erratic behavior, no member of the jail staff called a hospital, a doctor, or 911. However, Mr. Sanchez did discuss the situation with Sheriff Grubb and recommended that Mr. Borum be removed from the jail and transferred to a hospital, due to his unique physical deformities. Mr. Sanchez expressed reservations about the jail's ability to properly care for Mr. Borum:

> "Q: Did you [try to get Mr. Borum transferred out of the jail] because you were concerned about Mr. Borum?
>
> A: I just—I just didn't want somebody to die in our jail. . . . That was like a mistake waiting to happen. And, no, I didn't want it happening on my shift."

Sanchez Dep. 225:16-22 (App. 21). However, Sheriff Grubb declined to transfer Mr. Borum to a hospital, basing his decision, at least in part, on financial concerns and budgetary constraints— the Swisher County jail's budget for medical care was just $7,500 annually.

Mr. Borum collapsed in his cell at approximately 8:00 A.M. on February 1, 2013, struck his head, and was knocked unconscious. After the jail administrator called 911, EMS arrived and transported Mr. Borum to Swisher Memorial Hospital. He arrived at 8:30 A.M. and was given a CT scan, which revealed a subdural hematoma—a collection or pooling of blood outside of the brain. The doctors at Swisher Memorial Hospital determined that Mr. Borum needed medical care that the hospital could not provide and decided to transfer him to Northwest Texas

4

Hospital in Amarillo.  Upon his arrival at Northwest Texas Hospital, doctors examined Mr.

Borum and determined that it was too late to save him.  Mr. Borum died at the hospital.

## STANDARD FOR SUMMARY JUDGMENT MOTIONS

This Court may grant summary judgment on a claim if the record shows that there is no

genuine issue of material fact and that "the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if a reasonable jury could return a

verdict for the nonmoving party on the issue.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  Where the nonmovant bears the burden of proof at trial, the movant may either offer

evidence that undermines one or more of the essential elements of the nonmovant's claim, or

point out the absence of evidence supporting an essential element of the nonmovant's claim.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (where there is an absence of evidence

supporting an essential element of the nonmovant's claim, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial").

If the movant successfully carries this burden at the summary judgment stage, the burden

then shifts to the nonmovant to show that the court should not grant summary judgment.  *Id.* at

324.  The nonmovant must set forth specific facts that show a genuine issue for trial—only a

genuine dispute over a material fact will preclude summary judgment.  *Anderson*, 477 U.S. at

248, 256.  The nonmovant cannot rely on conclusory allegations, improbable inferences, or

unsupported speculation.  *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993).

In ruling on a summary judgment motion, the court must review the facts and draw all

reasonable inferences in favor of the nonmoving party—here, the Plaintiffs.  *See Reid v. State*

*Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

## DISCUSSION

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under the RA, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The RA is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Claims under both acts are analyzed using the same legal standards. *See Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011); *McPherson v. MHSAA*, 119 F.3d 453, 460 (6th Cir. 1997) ("[b]ecause the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other"). Thus, the Court will treat Plaintiffs' ADA and RA claims coextensively and will analyze them together, as though they were a single claim.

Establishing a prima facie case of disability-based discrimination under Title II of the ADA requires the plaintiff to prove (1) that he is a qualified individual under the ADA; (2) that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is

by reason of his disability. *See Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004).

In addition to a disability-based discrimination *prohibition*, the ADA also imposes on public entities an affirmative *obligation* to make reasonable accommodations for disabled individuals—including prisoners—who take advantage of a public entity's services or programs. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); 28 C.F.R. § 35.130(b)(7) ("[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity"). An accommodation is considered reasonable if it is sufficient to provide a disabled person "meaningful access to the benefit" offered by a public entity. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985).

This "reasonable accommodation" theory of discrimination is different from, yet related to, the prima facie case of disability-based discrimination discussed above. Specifically, a plaintiff can satisfy the second and third prongs of the prima facie case of disability discrimination by establishing that the public entity has failed to make reasonable accommodations for a disabled person who uses the services provided by the public entity. *See Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (holding that a prison's failure to satisfy the reasonable accommodation requirement may constitute a denial of services and intentional discrimination sufficient to satisfy the second and third prongs of the Title II ADA inquiry).

Defendant's summary judgment motion seeks dismissal of Plaintiffs' ADA and RA claims under Fed. R. Civ. P. 56. In its motion, Defendant challenges Plaintiffs to produce three

categories of evidence: (A) evidence that Defendant excluded Mr. Borum from participating in,
or denied Mr. Borum the benefits of, services, programs, or activities for which Defendant was
responsible; (B) evidence that Defendant's actions were motivated by discriminatory animus or
ill will; and (C) evidence that Defendant refused to provide Mr. Borum an accommodation.

### A. EVIDENCE THAT DEFENDANT EXCLUDED MR. BORUM FROM PARTICIPATING IN, OR DENIED MR. BORUM THE BENEFITS OF, SERVICES, PROGRAMS, OR ACTIVITIES FOR WHICH DEFENDANT WAS RESPONSIBLE

To satisfy the second element of the prima facie case of discrimination under Title II of
the ADA, a plaintiff must establish that he is being excluded from participation in, or is being
denied benefits, services, programs, or other activities for which a public entity is responsible.
*See Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671 (5th Cir. 2004). The Supreme Court,
in a unanimous opinion authored by Justice Scalia, held that confinement in a jail is a program or
service under the ADA and RA because "[m]odern prisons provide inmates with many
recreational 'activities,' *medical 'services,'* and educational and vocational 'programs,' all of
which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be
excluded from participation in)." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)
(emphasis added); *see also United States v. Georgia*, 546 U.S. 151, 157 (2006) ("it is quite
plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's]
disability-related needs in such fundamentals as mobility, hygiene, [and] medical care . . .
constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's
'services, programs, or activities'").

In its partial Motion for Summary Judgment, Defendant asserts that after seven months of
discovery "there is no evidence Swisher County excluded Terry Borum from participating in, or
denied Terry Borum the benefits of, services, programs, or activities, for which the County was

responsible." However, depositions of several Swisher County officials provide ample evidence that Defendant denied Mr. Borum access to both (1) food and (2) medical care while he was confined in the Swisher County jail.

1. *Evidence that Defendant Denied Mr. Borum Access to Food*

First, Plaintiffs produced evidence that Defendant denied Mr. Borum access to basic sustenance for at least three days. Because of Mr. Borum's disfigured face, he used a feeding tube sewn into his stomach to eat.   Throughout his confinement, jail officials failed to provide Mr. Borum with the nutritional supplements required by his feeding tube:

"Q: Was anything done to try and buy new [feeding supplements] for Mr. Borum?

A: No, sir."

Pointer Dep. 40:19-21 (App. 60).  Instead of providing him nutrition through his feeding tube, jail officials periodically fed Mr. Borum a mixture of honey and orange juice:

"Q:  And just so I'm clear, the decision to give him honey and orange juice, that was an intentional choice you made?

A: Yes."

Grubb Dep. 114:2-5 (App. 40).

"Q: Other than—the honey and orange juice was the major thing that he consumed in the jail; is that fair?

A: To my knowledge, yes, sir."

Irwin Dep. 38:4-7 (App. 56).

"Q: Did you tell Sheriff Grubb you were concerned that [Mr. Borum] hadn't eaten anything?

A: Yes, sir"

Irwin Dep. 38:11-13 (App. 56).

### 2. Evidence that Defendant Denied Mr. Borum Access to Medical Care

Second, Plaintiffs produced evidence that Defendant denied Mr. Borum access to medical care for the severe alcohol withdrawal and DTs he was experiencing. Jail administrators were aware that Mr. Borum was an alcoholic, was experiencing hallucinations, was at risk of injury, and needed medical care:

> "Q: Okay. That—that night before, you know, the symptoms, now that you know about alcohol withdrawal and DTs, were pretty severe; correct?
>
> A. Yes."

Sanchez Dep. 158:4-7 (App. 12).

> "Q: Do you agree with Mr. Sanchez that Mr. Borum needed to be placed in another facility for his own medical benefit?
>
> A: Yes."

Grubb Dep. 116:22-25 (App. 41).

> "Q: And what did you tell Mr. Sanchez?
>
> A: That—that due to [Mr. Borum's] conditions and we were understaffed and not really medically qualified to take care of someone in his condition, that we needed to either transfer him to somewhere else or give him a [personal recognizance] out."

Irwin Dep. 15:17-22 (App. 50). "You could obviously tell [Mr. Borum] was a medical risk. I mean, we couldn't—we couldn't take care of him." Pointer Dep. 17:18-20 (App. 59).

Despite awareness of this medical risk, Swisher County officials consciously chose not to call a doctor or a hospital because they were concerned about exceeding their limited budget for prison medical care:

"Q: Did you ever ignore something that Mr. Borum needed?

A: Yes.

Q: What'd you ignore?

A: His medical condition."

Sanchez Dep. 217:5-9 (App. 17).  "We didn't have the manpower, like I said, to send somebody up there every day around the clock.  You know, yes, you know, his hospital bills were incurring. We have a budget, you know.  I mean, I had to try to keep it within the scope of the budget." Grubb Dep. 56:15-19 (App. 32).

"Q:  Okay.  Similarly, you intentionally chose not to take him to a hospital, correct?

A: Correct.

Q: Intentionally chose not to call a doctor, correct?

A: Correct."

Grubb Dep. 114:12-17 (App. 40).

Indeed, Swisher County's only attempt to "treat" Mr. Borum's alcohol withdrawal and DTs involved feeding him honey and orange juice:

"Q: Now, when you were told that Mr. Borum was going through detox, were you aware of anything that was being done for him?

A: Yes.

Q: What was the county doing for Mr. Borum?

A: We were giving him orange juice and honey.

. . .

Q: You didn't think that was an appropriate medical treatment?

A: No."

11

Pointer Dep. 42:20-25, 43:23-25 (App. 62-63).

The Swisher County jail also did not have anyone on staff with the knowledge required to treat alcohol withdrawal and DTs, or to properly care for disabled prisoners:

> "Q: And had—had you arranged for or seen to it that anybody at the jail had any
>
> specialized training on this condition known as DTs or delirium tremens?
>
> A: No, sir."

Grubb Dep. 34:6-9 (App. 30).

> "Q: At any point while you were at Swisher County, do you recall receiving any training
>
> about the need to accommodate people's disabilities while at the jail?
>
> A: No, sir, no training."

Grubb Dep. 171:24-25, 172:1-3 (App. 45-46).

Defendant asserts that even if it did deny Mr. Borum access to certain services or programs, there is no evidence that it was actually *responsible* for those programs and services. However, providing food and medical care to prisoners is undoubtedly a program or service for which Defendant was responsible. State and county jails have a constitutional obligation under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to "tend to essentials of [prisoners'] well-being," including food and medical care. *Hare v. City of Corinth*, 74 F.3d 633, 638-39 (5th Cir. 1996); *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 244 (5th Cir. 1993).

Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that Swisher County was responsible for providing food and medical care to Mr. Borum, yet denied Mr. Borum those services by feeding him nothing more than honey and orange juice for three days and by failing to call a doctor, hospital, or otherwise provide medical care for Mr. Borum

when it was clear that he was experiencing severe symptoms of alcohol withdrawal and DTs.

Defendant's partial Motion for Summary Judgment is denied as to Defendant's argument that

Plaintiffs have failed to put forth evidence showing that Defendant excluded Mr. Borum from

participation in, or otherwise denied Mr. Borum benefits, services, programs, or other activities

for which Defendant was responsible.

### B.  EVIDENCE THAT DEFENDANT'S ACTIONS WERE MOTIVATED BY DISCRIMINATORY ANIMUS OR ILL WILL

To satisfy the third element of the prima facie case of discrimination under Title II of the

ADA, a plaintiff must establish that the exclusion, denial of benefits, or discrimination was by

reason of plaintiff's disability. *See Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72

(5th Cir. 2004).  Courts have universally interpreted this element of an ADA claim to require a

showing of intentional discrimination on the part of the defendant. *See, e.g., Delano-Pyle v.*

*Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002); *Meagley v. City of Little Rock*, 639 F.

384, 390 (8th Cir. 2011) ("[e]very circuit court to address the issue . . . has reaffirmed that

intentional discrimination must be shown to recover compensatory damages").

Here, Defendant asserts that there is no evidence that Swisher County's actions were

motivated by discriminatory animus or ill will.  However, as this Court previously explained in

its September 29, 2014 opinion denying Defendant's Motion to Dismiss, neither the Fifth Circuit

nor any other circuit court requires a showing of animus or ill will in order to establish

intentional discrimination under the ADA.  A majority of circuits have held that intentional

discrimination can be proved by showing that the defendant acted with deliberate indifference to

the strong likelihood of a violation of the ADA or RA. *See, e.g., Loeffler v. Staten Island Univ.*

*Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 194,

198 (3d Cir. 2013); *Meagley*, 639 F.3d at 389; *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138

13

(9th Cir. 2001); *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th

Cir. 2009); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012).

Although the Fifth Circuit has explicitly declined to adopt this widely-accepted deliberate

indifference standard for intentional discrimination under the ADA, it has also declined to

establish a definition of intentional discrimination that would require a showing of animus or ill

will. *See Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002); *Frame v. City

of Arlington*, 657 F.3d 215, 231 n.71 (5th Cir. 2011). Thus, Plaintiffs are not required to produce

evidence that Defendant's actions were motivated by discriminatory animus or ill will in order to

satisfy the third element of the prima facie case of disability discrimination.

     Although Plaintiffs do not have to show discriminatory animus or ill will, they must still

come forward with evidence at the summary judgment stage that creates a genuine issue of

material fact as to whether Defendant intentionally discriminated against Mr. Borum. The Fifth

Circuit has held that a defendant's failure to make reasonable accommodations to the needs of

disabled persons can constitute intentional discrimination under the ADA and RA. *See Melton v.

Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x

375, 382 (5th Cir. 2014) (holding that a prison's failure to provide reasonable accommodations

to disabled inmates may constitute intentional discrimination sufficient to satisfy the second and

third prongs of the Title II ADA inquiry); *see also Tennessee v. Lane*, 541 U.S. 509, 531 (2004)

(noting that Congress recognized "that failure to accommodate persons with disabilities will

often have the same practical effect as outright exclusion").

     Here, Plaintiffs have introduced evidence sufficient to create a genuine issue of material

fact as to whether Defendant failed to make reasonable accommodations for Mr. Borum—thus

discriminating against him by reason of his disability under the third prong of the Title II ADA

inquiry.  Because a discussion of the evidence establishing Defendant's failure to make

reasonable accommodations is presented in section (C), *infra*, the Court will not repeat that

analysis here.  Defendant's partial Motion for Summary Judgment is denied as to Defendant's

argument that Plaintiffs have failed to put forth evidence showing that Defendant's actions were

motivated by discriminatory animus or ill will.

C.     *EVIDENCE THAT DEFENDANT REFUSED TO PROVIDE MR. BORUM*
*AN ACCOMMODATION*

Under the "reasonable accommodation" theory of disability-based discrimination, Title II

of the ADA imposes an affirmative obligation on public entities to make reasonable

accommodations for disabled individuals who utilize their services or programs.  *See Tennessee*

*v. Lane*, 541 U.S. 509, 531-32 (2004); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454

(5th Cir. 2005).  A public entity's failure to abide by this reasonable accommodation obligation

may constitute a denial of services and intentional discrimination sufficient to satisfy the second

and third prongs of the prima facie case of discrimination under the ADA.  *See Garrett v. Thaler*,

560 F. App'x 375, 382 (5th Cir. 2014).  This principle has been extended to ADA claims in the

prison context, where the "failure to make reasonable accommodations to the needs of a disabled

prisoner may have the effect of discriminating against that prisoner because the lack of an

accommodation may cause the disabled prisoner to suffer more pain and punishment than non-

disabled prisoners."  *McCoy v. Tex. Dep't of Criminal Justice*, C.A. No. C-05-370, 2006 WL

2331055, at *7 (S.D. Tex. Aug. 9, 2006).  The reasonable accommodation obligation arises when

the defendant (1) knows of the individual's disability and (2) knows of the physical or mental

limitations resulting from the disability.  *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir.

1999).  An accommodation is considered reasonable when it is sufficient to provide a disabled

15

person "meaningful access to the benefit" offered by a public entity. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Here, Defendant argues that "there is no evidence Swisher County failed or refused to provide Terry Borum an accommodation due to disability." Defendant also argues that to survive summary judgment, Plaintiffs must "identify accommodations that were already available and not made for Terry Borum." In support of this argument, Defendant cites *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008) and *Owens v. O'Dea*, No. 97-5517, 1998 WL 344063, at *3 (6th Cir. May 27, 1998).

In *Douglas*, the court adopted a report and recommendation from a magistrate judge, which held that Title II "does not . . . create a right for a disabled inmate to demand that the prison implement a specific type of service, program, or activity that is not already available." *Douglas*, 567 F. Supp. 2d at 889.[1] And in *Owens*, the Sixth Circuit held that Title II of the ADA requires "'reasonable modifications' to public services and programs that discriminate on the basis of disability." *Owens*, 1998 WL 344063, at *3. Contrary to Defendant's argument, these cases do not support the proposition that Plaintiffs must "identify accommodations that were already available" for other inmates. *Douglas* merely holds that the ADA does not require prisons to provide *new* services or programs for a disabled prisoner. *Douglas*, 567 F. Supp. 2d at 889. But, as the Sixth Circuit made clear in *Owens*, public entities do have an affirmative obligation to make reasonable modifications or accommodations so that a disabled prisoner can have meaningful access to *existing* public services or programs. *Owens*, 1998 WL 344063, at *3; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

[1] The court in *Douglas* also held that "Title II does not require a prison to make reasonable accommodations for inmates with disabilities." *Douglas*, 567 F. Supp. 2d at 889. However, the Fifth Circuit has clearly held that the ADA's reasonable accommodation theory *does* apply in the prison context. *See Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) ("Title II imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners"); *see also McCoy v. Tex. Dep't of Criminal Justice*, C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006).

16

As discussed in section (A), *supra*, Plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to whether Defendant refused to provide Mr. Borum with a reasonable "accommodation" or "modification" that would allow Mr. Borum to access two *existing* public services or programs: prison food services and prison medical care. **First,** Plaintiffs presented evidence that Defendant knew of Mr. Borum's disability and the physical and mental limitations resulting from that disability. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999). Deposition testimony indicates that jail officials were aware of Mr. Borum's unique feeding requirements—including a feeding tube and special nutritional supplements. Jail officials were also aware that Mr. Borum was suffering from substantial medical problems during his detention—including severe alcohol withdrawal, DTs, and hallucinations. And Sheriff Grubb was aware that people suffering from alcohol withdrawal, like Mr. Borum, might "stumble and hurt themselves." Grubb Dep. 113:23 (App. 39).

**Second**, deposition testimony indicates that Defendant failed to provide Mr. Borum with a reasonable accommodation or modification that would give him meaningful access to food and medical care. *See Alexander*, 469 U.S. at 301. Defendant failed to provide Mr. Borum with the nutritional supplements required by his feeding tube and instead fed him nothing but honey and orange juice for three days. Defendant also failed to call a doctor, hospital, or otherwise provide medical care to Mr. Borum despite full awareness of Mr. Borum's urgent need for medical attention.

Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that Swisher County refused to provide Mr. Borum with a reasonable accommodation for his disabilities. Defendant's partial Motion for Summary Judgment is denied as to Defendant's

argument that Plaintiffs have failed to put forth evidence showing that Defendant refused to provide Mr. Borum with a reasonable accommodation.

**CONCLUSION**

Defendant's *Partial No Evidence Motion for Summary Judgment* is DENIED.

IT IS SO ORDERED.

Signed this the _____ day of January, 2015.

**MARY LOU ROBINSON**
**UNITED STATES DISTRICT JUDGE**